**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MICAH B. RIGGS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 14-0676-CV-W-FJG |
| ROBERT GIBBS, et al., | ) | |
| Defendants. | ) | |

**ORDER**

Pending before the Court are (1) Defendant Gary Majors' Motion for Summary Judgment (Doc. No. 158); (2) Motion for Summary Judgment for Defendants Kansas City Missouri Board of Police Commissioners, Gibbs, Onik, Dumit, Whaley, Toigo, Taylor, Barbour, Feagans and Martin (Doc. No. 160); and (3) Plaintiff's Motion for Partial Summary Judgment as to Defendants' Liability (Doc. No. 156). As an initial matter, plaintiff's request for oral argument will be denied.

**I.    Background**

Plaintiff filed the pending action on August 1, 2014.    Plaintiff's amended complaint was filed on February 24, 2015 (Doc. No. 43).    Plaintiff Micah Riggs is the former owner of a business named "Coffee Wonk" located in midtown, Kansas City.    On three separate occasions, certain of defendants searched plaintiff's business, allegedly finding synthetic marijuana.    Plaintiff was prosecuted in state court for (1) intent to create a controlled substance; (2) possession of drug paraphernalia with intent to distribute; and (3) possession with intent to distribute the controlled substance JWH-018.    Prior to trial, the possession of drug paraphernalia charge was dropped.    Plaintiff was acquitted of possession with intent to distribute JWH-018, and had a hung jury on intent to create a controlled substance.    The prosecutor's office subsequently dropped the charge for intent to create a controlled substance.    Plaintiff has filed the current action, challenging

the legality of the searches and other actions taken by defendants.

Defendants Alvin Brooks (hereinafter, "Commissioner Brooks"), Michael Rader (hereinafter, "Commissioner Rader"), Angela Wasson-Hunt (hereinafter, "Commissioner Hunt"), David Kenner (hereinafter, "Commissioner Kenner"), and Mayor Sly James (hereinafter, "Commissioner James") are sued in their official capacities as duly appointed members of the Board of Police Commissioners of Kansas City, Missouri. Defendant Gary Majors was at all relevant times the manager of Regulated Industries of Kansas City, Missouri. Defendant Detectives Robert Gibbs, Chris Onik, Alan Whaley, Teddy Taylor, and Christopher Toigo are sued in their individual and official capacities. Defendant Sergeant Brad Dumit is sued in his individual and official capacities. Defendant Officers Jason Martin, Michael Feagans, and David Barbour are sued in their individual and official capacities.

Plaintiffs' amended complaint contains seven counts: Count I: Claim Under 42 U.S.C. § 1983 for Malicious Prosecution, Illegal Search and Seizure, Filing of Falsified Court Documents, and Forging Consent to Search Forms (Against Gary Majors and Detectives Gibbs, Whaley, Onik, Dumit, Toigo, and Taylor, Officers Martin, Barbour, and Feagans, and The Board of Police Commissioners of Kansas City, Missouri); Count II: Claim Under 42 U.S.C. § 1983 for Conspiracy (Against Gary Majors and Detectives Gibbs, Whaley, Onik, and Dumit, and Officer Martin); Count III: Claim Under 42 U.S.C. § 1983 for Conspiracy (Against Detectives Toigo and Taylor, and Officers Barbour and Feagans); Count IV: Claim Under 42 U.S.C. § 1983 for Violative Policies, Practices and Procedures (Against The Board of Police Commissioners of Kansas City, Missouri); Count V: Claim Under Missouri Common Law for Malicious Prosecution (Against Gary Majors and Detectives Gibbs, Whaley, Onik, Dumit, Toigo, and Taylor, Officers Martin, Feagans, and Barbour, and The Board of Police Commissioners of Kansas City,

Missouri); Count VI: Intentional Infliction of Emotional Distress (Against Detectives Gibbs, Onik, Dumit, and Martin); and Count VII: Negligent Infliction of Emotional Distress (Against Detectives Whaley, Gibbs, Onik, Dumit, and Martin).

## II.  Facts

### A.  Introduction

Mr. Riggs brings this § 1983 claim against Defendants for violations of his Fourth Amendment Rights, malicious prosecution, and various other claims. In 2009, Mr. Riggs opened Coffee Wonk, a business at 3535D Broadway, Kansas City, MO 64111, which sold coffee, herbal incense, and potpourri. Mr. Riggs owned another business, the Wonk Exchange smoke shop, in the same building. Mr. Riggs also rented an office room, Suite 201, one floor above Coffee Wonk. On three separate occasions certain Defendants searched Mr. Riggs' businesses and seized his property. On September 27, 2010, Detectives Christopher Toigo and Teddy Taylor seized Syn incense from Coffee Wonk. That same day, Officers David Barbour and Michael Feagans entered and/or searched Suite 201. On October 3, 2012, Sergeant Brad Dumit, Detectives Robert Gibbs and Chris Onik raided Coffee Wonk without a warrant and seized all of Mr. Riggs' inventory. On February 11, 2013, Detective Gibbs obtained a search warrant for Coffee Wonk, which was executed on February 12, 2013.

All of the raids involved allegations that Mr. Riggs was selling "K2"— which he asserts he was not. "K2" is a slang term for several controlled substances. K2 is also a brand name for a product that previously contained JWH- 018. K2 itself is not illegal under the Missouri Revised Statutes. See R.S. MO. § 195.017.

### B.  The September 27, 2010, Incidents

#### i.  Defendants Feagans and Barbour

On September 27, 2010, Officers Barbour and Feagans received a burglary call for a business at 3535 Broadway. Some office spaces had broken glass fronts, and there was yellow powder everywhere from a fire extinguisher up and down the hallways. It appeared also that other units were damaged, although plaintiff disputes that Suite 201 was damaged. When they arrived, they proceeded to Suite 200 and interviewed the business owner, Julie Porter, who had reported the burglary. The officers investigated the burglary and were unable to find the perpetrator. A short time later, they met Christopher Long, the building manager for 3535 Broadway. After initially meeting Mr. Long, Officer Barbour began to search the second floor of the office suite.

Plaintiff asserts that Barbour asked Mr. Long to unlock the door to Suite 201. Defendants controvert this statement, saying that Mr. Long informed Officer Barbour that the occupant that owned the location with the robbery rented a suite and wanted Mr. Long to check on it. Plaintiff, on the other hand, argues that Mr. Long had made no statement to the police that would indicate that Mr. Riggs wanted the police to check on Suite 201. Plaintiff further states that he had not given permission to Mr. Long to open the door to the suite. Regardless, Mr. Long opened the door to the suite.

When Mr. Long opened the door to Suite 201, Officer Barbour saw lab equipment. Officer Barbour then contacted the Metro Meth Drug Task Force to process the lab. After the Task Force arrived, Officer Barbour provided security to the suite. The task force did not have plaintiff's consent to search Suite 201.

Prior to Mr. Long opening Suite 201, there were no signs of entry. Officer Feagans assumed that the burglar had left the office of Julie Porter. Officer Barbour had no specific reason to believe that the burglar was still in the building. Officer Barbour did not have his gun drawn during his search of the office complex with Mr. Long. When Officer Barbour first observed the lab, he did not see anything that led him to believe that it was illegal or

an active meth lab. However, Defendant Barbour observed chemicals with a skull and cross-bone, and believed that they were dangerous, so he indicated he left the door open to vent. Jason Kennedy, a chemist who responded with the Task Force, did not know what type of a lab was in Suite 201.

Plaintiff does not dispute that the lab was not safe even though there were no open flames or bottles. Most of the chemicals in suite 201 were very unsafe to not have in the proper environment. There was a canister with a label that said it spontaneously ignited with air. There were several solvents that were highly flammable, and toxic reagents present, as well as others that if not handled properly would ignite if in contact with water or the wrong substance. Officers Barbour and Feagans decided it was better to contact somebody with more knowledge so they contacted Metro Meth. Items recovered from suite 201 tested positive for JWH-018. JWH-018 was considered a controlled substance (MO Statute §195.017).

ii.    Defendants Toigo and Taylor

Also on September 27, 2010, Detective Toigo, who was assigned to the robbery unit, received a call that a robbery had occurred at Coffee Wonk. When Detective Toigo arrived, he interviewed the store clerk present for the robbery and began processing the scene. Det. Toigo looked behind the counter for fingerprints, and along the path of where the robbery suspect traveled. During his canvas, Detective Toigo went to the parking garage adjacent to the building and encountered Syn incense that had been stolen. Detective Taylor received a call from Detective Toigo, who informed Detective Taylor of the robbery and the Syn incense. Detective Yale Acton responded to the scene with Detective Taylor. At the scene, Detective Toigo showed Detective Taylor the packages of Syn incense behind the counter at Coffee Wonk.

At some point, Mr. Riggs arrived on the scene, and he and Detective Toigo

engaged in casual conversation related to the robbery. During these discussions, Detective Toigo obtained a written consent to search from Mr. Riggs. Mr. Riggs asserts he was told this consent was for Wonk Exchange, but argues that Toigo or Taylor added "Suite 201" to the address after Mr. Riggs signed it. Defendants controvert that this is what occurred. Plaintiff asserts that later on, Detectives Toigo and Taylor forged his signature on a consent to search Wonk Exchange, misspelling his printed name as "Michah Riggs." Again, defendants controvert this argument, saying that defendant Taylor filled out the form completely, and did not sign plaintiff's name on the form. Taylor testified he was standing next to plaintiff when plaintiff signed the consent to search form. Detectives Toigo, Taylor, and Acton seized the Syn incense behind the counter. Plaintiff Riggs argues he did not consent to the officers seizing all of the Syn behind the counter; defendants, however, indicate that plaintiff signed the consent to search.

Before September 27, 2010, Detective Taylor had not received any training regarding K2, had not seen it in the field, and had no experience with K2 in general. Detective Taylor had never before encountered nor heard of Syn brand incense. It was not immediately apparent to Detective Toigo that the Syn incense was illegal. Detective Acton's experience with K2 and synthetic marijuana at this time was limited. It was not immediately apparent to Detective Acton that the Syn incense was illegal.

While searching Suite 201, the police encountered Philrey Pamatmat, a chemist for plaintiff. Defendants indicate Mr. Pamatmat told Det. Acton that he was hired by plaintiff to try to create a legal version of the analogue for K2 or synthetic cannabinoid; plaintiff, however, indicates that he hired Pamatmat to test the products that were sold in Coffee Wonk. Acton also indicated that Pamatmat told him that Coffee Wonk was selling Syn incense, which led Acton to believe there was a possibility that the packets would contain an illegal version of a synthetic cannabinoid. The information that Det. Acton had

up to that point was that people were taking anything from potpourri to different plant growth, spraying chemical on it, packaging it up and distributing it.

Seth Cooper, a member of the task force that responded to Suite 201, attempted to field test some Syn found in Suite 201. At the time, there was not a good field test for those synthetic cannabinoids. This field test was not performed on the incense seized from behind the counter.   Mr. Cooper, however, recognized the packets behind the bar as Syn brand, which he had been seeing in the Kansas City area. At the time, not all synthetic cannabinoids were illegal, and alleged K2 packets did not consistently test positive for controlled substances. The crime lab did not keep records of what types of alleged K2 tested positive for controlled substances.   Cooper had tested Syn packets before, and most came back as containing JWH-018 and JWH -073. Plaintiff notes, however, that on the date of the seizure, JWH-018 and JWH-073 had been controlled for less than a month under Missouri law. Items recovered by Det. Acton from the Coffee Wonk tested positive for JWH- 018.

C.   The October 3, 2012 raid

On October 3, 2012, Detectives Gibbs and Onik and Sergeant Dumit seized property from Coffee Wonk without a warrant. Sergeant Dumit was a supervisor in the Vice section. Det. Onik was a vice detective assigned to Narcotics and Vice division. Det. Whaley was a detective in the Vice unit. Det. Gibbs also was a detective in the Vice unit. The vice unit investigates prostitution, gambling, alcohol and tobacco violations, human trafficking and adult bookstores. Det. Gibbs was responsible for the investigation of places that sold alcohol.

i.   Defendant Gary Majors

Gary Majors was the manager of Regulated Industries, the city authority in charge of regulating, among other things, liquor licenses. Defendant Majors served as the

Manager of Regulated Industries from September 17, 2007, until March 2, 2013. Regulated Industries is a division of the City of Kansas City, Missouri's Neighborhood and Community Services Department. Regulated Industries works with the Kansas City Police Department (hereinafter "KCPD") and other law enforcement and regulatory agencies. Majors received a tip from an acquaintance that a business at 35th and Broadway with "coffee" in its name was selling K2. Defendant Majors did not directly contact the KCPD; instead, he instructed the Regulated Industries Lead Investigator, Gerald Countz to contact the KCPD regarding the tip. Defendant Majors searched the electronic database maintained by Regulated Industries and determined that an establishment named "Coffee Wonk" at 3535 Broadway had a liquor license. Thereafter, on September 19, 2012, Gerald Countz emailed Detective Brad Dumit and Detective Robert Gibbs at the KCPD regarding the tip received by Defendant Majors and that the Coffee Wonk sold alcohol. At some later time, Defendant Majors determined that Coffee Wonk did not have a liquor license. Defendant Majors admits that once it was determined that the Coffee Wonk did not have a liquor license, he did not make an attempt to correct the incorrect statement made in Gerald Countz's September 19, 2012 email.

Detective Robert Gibbs, who received the complaint from Mr. Majors's office, did not independently check whether Coffee Wonk had a liquor license even though he had the capability to do so. (Defendant Gibbs does not controvert this statement; however, he indicates that to verify whether an establishment had a liquor license, Defendant Gibbs would have contacted Regulated Industries, defendant Majors' office.) Defendant Majors was not present at the Coffee Wonk on October 3, 2012, the date of the controlled buy. Defendant Majors did not participate in the controlled buy or subsequent investigation.

ii.    The purpose of the search of Coffee Wonk

After receiving the complaint, Detective Gibbs briefed Detectives Whaley and Onik and Sergeant Dumit on Coffee Wonk. At the briefing, Detective Gibbs said they were going to Coffee Wonk to attempt to find and/or buy K2. Defendants, however, argue that there was a dual purpose to this search, and part of the purpose was a tavern check. Detective Gibbs instructed Detective Whaley to enter Coffee Wonk and attempt to purchase "Mr. Happy."

The purpose of a tavern check is to check licenses and compliance with city ordinances. Under liquor law licenses, officers are allowed to look anywhere where one may store alcohol and check their licenses. City ordinances authorize police officers to go into backrooms and stock rooms, and look in places where alcohol may be stored. Missouri Code of Ordinances for Kansas City, Section 40-28(h) and Section 10-34(a)). Defendants argue that checking the liquor license at the Coffee Wonk was one of the primary purposes of the search, but that another reason they went to Coffee Wonk was to investigate the complaints, making this a dual purpose search.

iii.     The raid

On October 3, 2012, Detective Whaley entered Coffee Wonk to conduct the controlled buy and asked for Mr. Happy or Mean Green. The clerk, Shon Ledbetter, informed Detective Whaley that Coffee Wonk did not have either brand and instead sold him a packet of Remix. After Detective Whaley purchased the packet of Remix, the rest of the product was placed under the counter, out of sight. At that time, Det. Whaley had some experience with the packaging of "K2" and how it was sold, including the one to three gram packages that were decorative.   Det. Whaley believed the item he purchased was packaged exactly the same as contraband in his experience; plaintiffs dispute this assertion, arguing that Whaley did not have enough experience to be able to tell contraband from non-contraband.   Defendants argue other factors that led Whaley to

believe it was contraband were that it was stored out of sight and was not advertised. After the purchase, Det. Whaley told the other officers where they could find the Remix. Det. Whaley showed Det. Gibbs the packet he had purchased and told him that the packet came from under the counter.

Officer Martin was assigned to Central Patrol in October 2012. Officer Martin met up with Det. Gibbs because dispatch called him and told him to meet vice at a certain location. Officer Martin was informed that they just did a buy and they wanted him because he had his uniform on and would be identifiable to anybody. Det. Gibbs and Det. Onik were wearing plain clothes and had their badges around their necks. Vice usually likes a uniformed officer to be there when they do these things so they can keep the peace and they want everybody to know that they are police. Officer Martin was only there to secure the scene and make sure nothing went wrong.

A short time after Detective Whaley purchased the Remix, Detectives Onik and Gibbs entered Coffee Wonk. At this time, Detectives Onik and Gibbs were unable to see any Remix behind the counter. Detective Gibbs could not see the Remix until he was behind the counter near the register. Defendants argue that based on the packaging and his experience, Det. Gibbs believed this to be contraband. Plaintiff disputes, arguing that Gibbs had only participate in eight to twenty prior alleged synthetic cannabinoid busts and had not seen Remix before. Plaintiff also notes that Vice only ordered lab tests on alleged synthetic cannabinoids if the suspects request their property back, and Mr. Riggs was the only person who had asked for his property back. Thus, plaintiff argues, Gibbs, without having confirmatory lab testing, would not be able to distinguish synthetic cannabinoids from legal herbal incense, according to plaintiff. Gibbs seized all of the Remix that he found behind the counter, along with other similar products. Detectives Gibbs and Onik also searched an envelope full of money to find the money used to buy

the Remix. They had to move money in the envelope to observe serial numbers. Detective Gibbs then seized all of the money in that envelope. Det. Gibbs indicates he believed that there was a liquor license at the Coffee Wonk, which would allow him to go behind the counter. Plaintiff argues that Detective Gibbs could not have reasonably believed that Coffee Wonk had a liquor license, given the facts of this case. Detective Gibbs, moreover, observed bottles that he thought were alcohol bottles; however, plaintiff indicates those bottle were coffee syrup bottles, which are easily distinguishable from liquor bottles. Detective Gibbs indicates he looked for a liquor license and business license behind the bar, and did not see either of them. Plaintiff disputes this fact, however, indicating that Gibbs was not really looking for a liquor license, but was instead just looking for alleged synthetic narcotics.

Meanwhile, Detective Onik searched a storeroom and seized all of the Remix he found there. The storeroom that Detective Onik searched was behind the counter and not part of the public space of Coffee Wonk. Detective Onik indicates that when he entered the business, he could clearly see what he believed to be synthetic narcotics in the back business room; plaintiff, however, indicates the general practice of Coffee Wonk was to cover the storage room with a curtain during business hours, so the room contents would not be in plain view. Det. Onik observed a scale, envelopes, stickers, and an iron, and clear tubs containing what he thought was either marijuana or some type of synthetic narcotic; plaintiff indicates, however, that the tubs did not contain marijuana or synthetic cannabinoids. When Mr. Ledbetter tried to question the police, Detective Onik told him to "shut his fucking mouth." Detectives Gibbs and Onik did not leave an evidence receipt. They did not arrest Mr. Ledbetter. Mr. Ledbetter was not arrested because, based on Detective Gibbs' training and knowledge at the time, there was not probable cause to do so. The October 22, 2012 lab report indicated that several recovered items contained

XLR-11 or 5FUR-144.

Neither Detective Whaley nor Detective Gibbs had never encountered the Remix brand before. It was not immediately apparent to Detective Onik that the Remix was contraband. Sergeant Dumit had not received training on identifying K2. Before the October 3, 2012, raid at Coffee Wonk, Detective Gibbs had participated in approximately eight to 20 other alleged K2 raids. All of these previous raids were done without a warrant. Detective Whaley had been involved in 10 to 12 other similar "buy busts" and cannot recall a single instance where a search warrant was obtained. The normal procedure for these searches was to seize product without a search warrant. For these previous raids, the alleged K2 generally was not sent to the lab for testing to ensure the presence of a controlled substance. For the lab tests that were performed, the alleged K2 did not consistently test positive for controlled substances.

D. The February 11, 2013 search warrant

The Remix seized in 2012 was submitted for lab testing, which revealed that it contained a chemical known as XLR-11. This testing did not happen until after Mr. Riggs had lodged a complaint regarding the October 3, 2012, search of his business. On February 6, 2013, Officer Schwalm bought a package of Speak Easy potpourri from Coffee Wonk. Det. Gibbs applied for a search warrant based on the evidence obtained from the October 3, 2012 search, the February 6 controlled buy and the lab reports from February 7, 2013. In the application for the warrant, Gibbs wrote it was determined that items recovered on October 3, 2012 contained XLR-11 or 5FUR-144; and that the leafy substance obtained on February 6, 2013 contained XLR-11 or 5FUR-144. Detective Gibbs, in the search warrant application, alleged that XLR-11 was a controlled substance analogue of JWH-018.

When Detective Onik received the crime lab's October 22, 2012, report, he discussed the results with chemists in the crime lab. The chemists told Detective Onik that the Missouri Analogue Statute did not cover XLR-11. This information does not appear on the search warrant application. Of his conversations with the chemists, Detective Onik told Detective Gibbs only that "everything was fine." Plaintiff argues that if Detective Onik had instead relayed accurate information to Detective Gibbs regarding XLR-11's legal status, Detective Gibbs would not have applied for a search warrant because the affidavit would have been inaccurate.

The KCPD crime lab had also issued a list of substances considered to be analogues. This list did not include XLR-11. The list did not include XLR-11 because at the time, the KCPD crime lab had no procedures to determine whether two substances shared a substantially similar chemical structure. Nobody in the KCPD crime lab was trained in the neurological effects of allegedly controlled substances. This information does not appear in the search warrant application.

It appears, however, that Det. Onik checked not only with the crime lab, but also with the DEA. Detective Onik testified the DEA told him that, as for their standards, they considered XLR 11 to be illegal. Det. Gibbs also indicated he relied on a DEA memo which he believes stated that XLR-11 was an analogue. Plaintiff indicates, however, that the DEA memo does not call XLR-11 an analogue, but merely indicates that the DEA may wish to consider pursuing analogue status as to that compound in the future.

A search warrant for 3535 Broadway was granted by Judge Byrn on February 11, 2013. Det. Onik was not involved in the execution of the warrant or the case with Coffee Wonk. The warrant was executed on February 12, 2013.

E.    Damages

Plaintiff's expert report states that Plaintiff's depressive symptoms are noted but

they do not reach a level of clinical significance. Plaintiff's expert report that his scores are consistent with a normal level of anxiety.   Plaintiff's expert report states that a diagnosis of PTSD is not supported.

F.     Underlying State Criminal Cases

A suppression hearing was conducted in regards to Plaintiff's underlying criminal case on February 7, 2013 before the Hon. Edith L. Messina, in the Jackson County Circuit Court, Division 12. The court denied Plaintiff's (then Defendant) motion to suppress. There are two Indictments against Riggs dated March 29, 2013 and June 7, 2013. (Ex P-1, and P- 2). Ultimately, plaintiff was acquitted of possession with intent to distribute JWH-018, and had a hung jury on intent to create a controlled substance.   The prosecutor's office subsequently dropped the charge for intent to create a controlled substance.

**III.     Standard**

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole

> could not lead a rational trier of fact to find for the nonmoving
> party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

For qualified immunity cases, "once the predicate facts have been established,…there is no such thing as a 'genuine issue of fact'…The conduct was either 'reasonable under settled law in the circumstances,' or it was not… ." Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)) (citation and alterations omitted). See also Scott v. Harris, 550 U.S. 372, 381 n.8 (2007). The "predicate facts" include only the relevant circumstances and the acts of the parties: conclusions or arguments about the reasonableness of those circumstances or actions are not genuine disputes of material fact that would preclude summary judgment. Scott, 550 U.S. at 381 n.8; Pace, 201 F.3d at 1056.

## IV.    Discussion

### A.    Defendant Majors' Motion for Summary Judgment (Doc. No. 158)

Defendant Majors is named as a defendant in Counts I, II, and V of the First Amended Complaint.   Count I is a Section 1983 claim for malicious prosecution, illegal search and seizure, the filing of falsified court documents, and forging of consent to search forms.   Count II is a Section 1983 claim for conspiracy.   Count V is a Missouri common law claim for malicious prosecution against Majors and a variety of other defendants. Defendant Majors indicates that his limited involvement in this action (by forwarding a tip through one of his employees to the Vice squad) should not make him liable for a violation of plaintiff's rights under the cConstitution or otherwise.

For the Section 1983 claims, defendant Majors argues that the doctrine of qualified immunity applies. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'" <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (citations omitted). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violated that right.'" <u>Mullenix</u>, 136 S. Ct. at 308 (quoting <u>Reichle v. Howards</u>, 566 U.S. 658 (2012) (slip op., at 5) (internal quotation marks and alteration omitted)). This inquiry is judged by an objective standard, and application to a defendant's conduct is a question of law for a court to determine well before trial. <u>Swenson v. Trickey</u>, 995 F.2d 132, 133 (8th Cir. 1993).

Here, defendant Majors argues he was exercising discretion in investigating and directing staff to forward a tip regarding illegal activity onto the KCPD.   Majors received a tip from a fellow church member that an establishment located at 35th and Broadway was selling synthetic marijuana – specifically K2. After receiving the tip, Defendant Majors searched an electronic database maintained by Regulated Industries to determine if there was a liquor permit for 3535 Broadway. Majors then argues that, as a result of that initial search, he mistakenly believed that the Coffee Wonk, located at 3535 Broadway, possessed a liquor license. Majors then directed Gerald Countz to contact KCPD regarding this tip.   Countz emailed Defendants Gibbs and Dumit on September 19, 2012, in regards to a complaint of alleged K2 sales at the Coffee Wonk. Based on Defendant Majors' mistaken belief, that the location possessed a liquor permit, Countz also informed Defendants Gibbs and Dumit that Coffee Wonk sold liquor. After the email had been sent, Majors learned that his initial search was incorrect and that Coffee Wonk did not actually possess a liquor license. Exhibit 3, 31:9-19, 47:1-17.

Majors argues that his activity of asking his subordinate to forward a tip to the KCPD, even when part of that tip was mistaken, should be shielded by qualified immunity because forwarding a tip of potentially illegal activities to the KCPD is reasonable, and any alleged constitutional violation for failing to double check a search using different

database parameters before passing on a tip to law enforcement was not "clearly established" to put Majors on notice that his actions were unlawful. See Pearson v. Callahan, 555 U.S. 223, 242 (1999). This Court agrees. Plaintiff has pointed to no facts showing that Majors' act in forwarding a tip to the KCPD was based on anything but Majors' reasonable, but mistaken, belief. Thus, the Court finds that qualified immunity applies as to Counts I and II against defendant Majors.

In addition, with respect to the merits of the allegations made in Count I, the Court finds that, for the reasons stated by defendant Majors: (1) any malicious prosecution claim must be dismissed because "The Eighth Circuit has uniformly held that malicious prosecution is not punishable under § 1983 because it does not allege a constitutional injury." Kurtz v. City of Shrewsbury, 245 F.3d 753, 758 (8th Cir. 2001); (2) with respect to the alleged illegal search and seizure related to the October 3, 2012 search, there is no indication that Majors knew or had reason to know that his forwarding of a tip would lead to alleged constitutional violations; (3) there is no indication that Majors was responsible for filing false court documents; and (4) there is no indication that Majors participated in forging consent to search forms.

With respect to the claim under Section 1983 for conspiracy, made in Count II of the amended complaint, the Court notes that in addition to qualified immunity, there are no facts under which the Court can find a "meeting of the minds" sufficient to support a conspiracy claim. To prove a § 1983 conspiracy claim, Plaintiff must prove: "(1) that the defendant[s] conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured [him]." White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). "[T]he plaintiff must allege with particularity and *specifically demonstrate with material facts* that the defendants reached an agreement." City of Omaha

Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989) (emphasis added) (citations omitted). The bare, unsupported allegation that the defendants had the opportunity to conspire "is obviously not sufficient to 'nudge' a conspiracy claim 'across the line from conceivable to plausible.'" Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026, 1050 (D. Minn. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[A]llegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a 'meeting of the minds.'" Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir. 1985) (quoting Smith v. Bacon, F.2d 434, 436 (8th Cir. 1983)).

The evidence in this case is that defendant Majors communicated only with members of his staff, directing Investigations Supervisor Countz to contact the KCPD with the tip.   Countz emailed the KCPD on September 19, 2012. Thus, plaintiff lacks evidence demonstrating a meeting of the minds between Majors and any of the other alleged conspirators. Thus, for these additional reasons, Majors' motion for summary judgment as to Count II must be **GRANTED.**

Finally, with respect to the claim for malicious prosecution under Missouri common law (Count V), Majors asserts such claim is barred by the public duty doctrine, the doctrine of official immunity, and by being unable to meet the elements of the claim under Missouri law.   Plaintiff does not respond to any of defendant's arguments that the malicious prosecution claim should be dismissed.   Therefore, for the reasons stated by defendant Majors, the Court will **GRANT** Majors motion for summary judgment as to Count V, as well.

Accordingly, for all the foregoing reasons, defendant Majors' Motion for Summary Judgment is **GRANTED IN FULL.**

**B.** **Defendants Kansas City Missouri Board of Police Commissioners, Gibbs, Onik, Dumit, Whaley, Toigo, Taylor, Barbour, Feagans and Martin's Motion for Summary Judgment (Doc. No. 160)**

The police department defendants argue that qualified immunity bars most of the federal claims against them, and that the state claims ought to be dismissed as well. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and it "protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 134 S.Ct. 3, 5 (U.S. 2013) (quotation marks omitted). "[Q]ualified immunity analysis involves the following two step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Smith v. City of Minneapolis, 754 F.3d 541, 545 (8th Cir. 2014 (quotation marks omitted). For the second step of the inquiry "[a] right is clearly established if its contours are sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." Id. at 546 (emphasis added) (quotation marks omitted).

In their analysis, Defendants look to the framework as to whether there was probable cause to seize the items at issue in this case. The existence of probable cause, "depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Solomon, 432 F.3d 824, 827 (8th Cir.2005) (quoting United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995)). This determination is made "from the viewpoint of a reasonably prudent police officer acting in the circumstance of the particular case." United States v. Reinholz, 245 F.3d 765, 776 (8th Cir.2001). Plaintiff, however, argues that the defendants have skipped over a big step of the qualified immunity analysis: most of the searches were done without a warrant, and plaintiff has set forth arguments as to each that they were done without a valid exception to the warrant requirement. Warrantless searches are presumptively unreasonable and presumptively unconstitutional. United States v.

Rouse, 148 F.3d 1040, 1041 (8th Cir. 1998). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." Riley v. California, 134 S.Ct. 2473, 2482 (2014). Probable cause alone is not an exception to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971) (noting that "no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances").The Court will consider each of the separate search and seizure events, below.

### 1. Count I - Search and seizure for Suite 201 in 2010

Defendants Barbour and Feagans indicate that, given the totality of the circumstances, once they observed the chemicals and lab equipment through an open door, they reasonably believed they had consent to search the premises. Defendants Barbour and Feagans indicate that the building manager, Mr. Long, told them that a tenant wanted him to check on his rented suite, #201. Defendant Barbour went with the property manager when he checked on the building. Defendants indicate that when Mr. Long opened the locked door to Suite 201, Officer Barbour could see inside the room, and once he could see the lab equipment and chemicals, due to the potential safety hazard, he contacted metro meth. Defendants Barbour and Feagans suggest that it was reasonable for them to take the steps they took upon seeing the contents of Suite 201, and that they had probable cause to take the measures they did.

Plaintiff, in response, notes that in general, landlords cannot give consent to search a lawfully rented apartment. See Chapman v. United States, 365 U.S. 610, 616–18 (1961) (finding unlawful a search where evidence was obtained without a warrant but with the consent of the defendant's landlord). Furthermore, plaintiff argues that defendants have not presented the testimony of Mr. Long indicating what his tenant told him; instead, plaintiff argues that Barbour and Feagans present only hearsay as to what

Mr. Long was told to do. Plaintiff indicates that Barbour and Feagans' testimony presents a credibility issue, as Mr. Riggs testified that he only spoke to Mr. Long in the Coffee Wonk, and asked him about what happened upstairs, and he never told Long that he wanted him to look into Suite 201 (which was locked with no signs of a break-in when the door was opened by Mr. Long). Accordingly, plaintiff argues that fact issues preclude summary judgment as to whether Long had permission from the tenant to open the door, and whether the officers could have reasonably believed under the circumstances that they had proper consent to search the premises of Suite 201.[1] The Court concludes that plaintiff has sufficiently demonstrated that questions of material fact exist as to whether Long had plaintiff's consent to open the door and whether the police officers could have reasonably believed they had consent to search the premises; therefore, summary judgment must be denied on this point.

> **2. Count I - Alleged illegal search and seizure of the Coffee Wonk in 2010.**

Defendants Acton, Toigo, and Taylor seized incense from behind the counter of Coffee Wonk after the robbery investigation was over. These officers indicate they had the consent of plaintiff to seize these contents; however, plaintiff indicates that his signature on the consent forms was forged. For the reasons stated below in regards to plaintiff's forgery claim, the Court finds that material facts exist as to whether the officers had the consent of plaintiff (or reasonably believed they had the consent of plaintiff) to seize those items.

---

[1] As noted by plaintiff, plain view doesn't really answer the question presented. If the officers had a reasonable belief they had consent to search (a question where material facts remain), then once the door was open the contents are in plain view and they following activities were likely reasonable under the law. However, if there was no consent to search Suite 201, there's no other exception to the warrant requirement that allows the items to be searched and seized.

Although it is apparent that Toigo had a lawful right of access to the incense when he observed it during his robbery investigation (and therefore the initial observation was not unconstitutional), if one views the facts in the light most favorable to plaintiff, the later seizure of the incense is potentially unconstitutional because Mr. Riggs refused to consent to that seizure and any previous consent was revoked. See United States v. Fletcher, 91 F.3d 48, 50 (8th Cir. 1996) (detention of bag without reasonable suspicion violated the Constitution when criminal defendant revoked consent he previously had given for police officers to detain bag).

Plaintiff also argues that none of the defendants had enough knowledge about K2 and other cannabinoid analogues to be able to form probable cause that the items seized contained "synthetic cannabinoids" or were otherwise contraband. However, with respect to the 2010 robbery investigation, Detective Acton spoke with plaintiff's chemist, Mr. Pamatmat, who told Acton that he was trying to create an analogue of synthetic cannabinoid for plaintiff. Detective Acton indicates this led him to believe that the packets found at Coffee Wonk possibly would contain an illegal version of synthetic cannabinoid. The Court finds that the conversation with Mr. Pamatmat is sufficient to have given the police officers arguable probable cause that the seized items were contraband. See Ransom v. Grisafe, 790 F. 3d 804, 813 (8th Cir. 2015) (finding officers immune as long as they had arguable probable cause, a mistaken but objectively reasonable belief that there had been a criminal offense.). Accordingly, to the extent that plaintiff argues there was no probable cause because defendants in the 2010 case could not identify the packets as contraband, that argument is rejected.

Nonetheless, for the reasons stated above, plaintiff's case may proceed to trial as to whether consent was given for the seizure of the items behind the counter in 2010.

**3.    Alleged illegal search and seizure of the Coffee Wonk in 2012.**

The Court finds that the "buy" made by Detective Whaley as an undercover officer does not violate plaintiff's constitutional rights, and at the very least Detective Whaley's actions in making that buy are covered by qualified immunity.   Furthermore, the facts are that Officer Martin's only involvement in this incident was to provide uniformed security during the other officers' search of Coffee Wonk.   Therefore, all claims against Officer Martin are **DISMISSED**, and any claims related to Detective Whaley's controlled buy are **DISMISSED.**

The remaining actions by Det. Gibbs, Det. Onik, and Sgt. Dumit during the 2012 search are more questionable.   Defendants argue that many of the items seized were in plain view – however, there are questions of material fact as to whether the curtain to the back room was open and whether any of the material behind the back counter was open to defendants.

Gibbs, Onik, and Dumit also argue that they have qualified immunity because they had a reasonable basis to believe they could go lawfully behind the counter and into the back room of the establishment, as they were conducting a tavern check.   "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, [or] *a mistake of fact… .*" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (emphasis added). The defendants argue that they went into Coffee Wonk with a dual purpose:  to recover illegal contraband, and to do a tavern check, which they believed they were able to do because they had been told by regulated industries that Coffee Wonk had a liquor license.

There are two problems with this argument.   First, although the defendants may have had a reasonable yet mistaken belief that Coffee Wonk had a liquor license prior to conducting the search, at some point in time while conducting the search, that belief may have become unreasonable due to the business having no alcohol on the premises and

no liquor license. It is unclear from the facts elucidated by the parties as to when the defendants knew (or should have known) that Coffee Wonk had no alcohol on site, and therefore the Court finds questions of material fact present that prevent summary judgment in favor of or against either plaintiff or defendants. The second problem with defendants' argument is that plaintiff has presented substantial facts supporting his argument that there was no real "dual purpose" for this search, but instead the administrative search was a "pretext for obtaining evidence of violation of penal laws." See Whren v. United States, 517 U.S. 806, 811–12 (1996) ("we never held, outside the context of inventory search or administrative inspection, that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment"). There is no administrative search exception "where the officer's purpose is not to attend to the . . . investigation for which the administrative inspection is justified." Ashcroft v. al-Kidd, 563 U.S. 731, 737 (2011). An administrative search which is a mere subterfuge for a criminal investigation violates the Fourth Amendment. See United States v. Wallace, 102 F.3d 346, 348 (8th Cir. 1996) ("[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search"); Colorado v. Bertine, 479 U.S. 367, 372 (1987) (inventory search permissible when "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"). Here, plaintiff argues that several defendants have acknowledged that this was not a typical tavern check, but that the search was carried out specifically to check for alleged K2. Assuming facts in the light most favorable to plaintiff, plaintiff has sufficiently set forth a claim that defendants Dumit, Onik, and Gibbs violated plaintiff's constitutional rights, and the rights were clearly established at the time of the alleged misconduct.

Given the above, questions of material fact remain precluding summary judgment, and the Court further finds that qualified immunity cannot preclude plaintiff's claims given that (1) questions remain for trial as to the purpose of the search; and (2) even if the search had a proper "dual purpose," questions remain as to when (or if) defendants' belief that Coffee Wonk had a liquor license was reasonable once the search began. Defendants' motion for summary judgment as to the claims against Gibbs, Onik, and Dumit is **DENIED.**[2]

### 4. Count I - Alleged illegal search and seizure of the Coffee Wonk in 2013 and alleged filing of falsified court documents.

At this search, defendants had obtained a warrant. In the context of a search with a warrant, qualified immunity is only lost where the warrant application is so lacking in an indicia of probable cause as top render official belief in its existence unreasonable. George v. City of St. Louis, 26 F.3d 55, 57 (8th Cir. 1994). The Supreme Court in Malley v. Briggs, reiterated its strong support of the "preference to be accorded searches under a warrant," and "indicated that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." Malley v. Briggs, 475 U.S. 335, 35 n 7., (1986) (quoting Jones v. United States, 362 U.S. 257, 270, 80 S.Ct. 725, 735-736, 4 L.Ed.2d 697 (1960)).

A warrant must be based on a truthful showing of acts that to establish probable cause. Franks v. Delaware, 438 U.S. 154, 164-165 (1978). However, "[t]ruthful" only means "that the information put forth is believed or appropriately accepted by the affiant as true." Id. An officer does not lose qualified immunity because of a mistaken, yet reasonable belief, nor does he lose immunity because of a reasonable mistake regarding

---

[2] The Court finds, however, that the defendants have demonstrated that they had arguable probable cause to believe that the product they seized was contraband, given that the various detectives had experience in seeing the packaging and sale of other types of synthetic cannabinoids, the product was kept behind the counter or behind the curtain (i.e., hidden from public view), and was not advertised in store displays.

the legality of his actions. <u>Saucier</u>, 533 U.S. at 205-206. "Summary judgment is appropriate if there is *any* reasonable basis to conclude that probable cause existed." <u>Cross v. City of Des Moines</u>, 965 F. 2d 629, 632 (8th Cir. 1992).

Defendants argue that the warrant here was based on defendant Gibbs' reasonable belief there was probable cause to obtain the warrant, and that search warrant was issued by Judge Byrn. Defendants note that plaintiff does not deny that much of the information in the warrant was actually true, such as that the items recovered in October 2012, or as part of undercover buys in 2013, contained XLR- 11. Instead, plaintiff bases his disagreement on Det. Gibbs' reliance on a memo provided by another law enforcement agency (the DEA) that indicated that XLR-11 should be considered an analog of JWH-018, a synthetic cannabinoid specifically mentioned in the applicable Missouri criminal statute.

Plaintiff contends that the warrant was misleading because it omitted the fact that XLR-11 was not listed as a controlled substance analog at the time under Missouri law. Defendants note this mis-states the 2013 statute, which defined a controlled substance analogue as:

> a substance the chemical structure of which is *substantially similar* to the chemical structure of a controlled substance in Schedule I or II and: (a) Which has a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance included in Schedule I or II; or (b) With respect to a particular individual, which that individual represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance included in Schedule I or II.

RSMo §195.017 (2013) (emphasis added).

Plaintiff argues that the KCPD crime lab would not testify that XLR-11 fit the above definition at that time, and that defendants should have included that information on their

warrant request. However, defendant correctly notes that the KCPD crime lab is not the only arbiter of what is or is not an analogue under Missouri's controlled substances statute. To obtain a conviction with this statute, a prosecutor would have to prove beyond a reasonable doubt that XLR-11 met the criteria of this statute, requiring the testimony of a properly qualified expert. But, for a search warrant, all the is required is probable cause, based on a truthful showing. Franks v. Delaware, 438 U.S. 154, 164-165 (1978). And, "[t]ruthful" only requires "that the information put forth is believed or appropriately accepted by the affiant as true." Id. Here, defendants argue that the DEA memo stating that XLR-11 is *substantially similar* to JWH-018, taken together with the laboratory results and the facts known to the defendants at the time are sufficient for at least arguable probable cause that XLR-11 is an analogue of a type of synthetic cannabinoid. This Court agrees. Accordingly, because the Court finds that because the DEA had found XLR-11 is substantially similar to JWH-018, defendants had arguable probable cause supporting their application for search warrant. The Court, therefore, **GRANTS** defendants' motion for summary judgment as it relates to purportedly false statements on the warrant application, as well as illegal search and seizure based on that warrant.

### 5.    Count I - Alleged forged consent to search form.

Defendants argue there is no evidence supporting plaintiff's claim of a forged consent form, other than plaintiff's allegations. However, the Court finds that plaintiff's allegations of forgery are sufficient to cause a dispute of material fact. Defendants attempt to argue that this issue was already decided at plaintiff's suppression hearing in state court, where the Circuit Court declined to suppress any evidence, including the consent to search forms. However, as noted by plaintiff, his attorneys were allowed to put on evidence at trial that the consent to search forms were forgeries, and ultimately

plaintiff was acquitted. Under these circumstances, collateral estoppel does not apply. See In re Caranchini, 956 S.W.2d 910, 912 (Mo. 1997), as modified on denial of reh'g (Dec. 23, 1997) (finding collateral estoppel bars a plaintiff from "relitigating issues of ultimate fact that have previously been determined by a valid judgment."); Figgins v. State, 469 S.W.3d 469, 473 (Mo. App. W.D. 2015), reh'g and/or transfer denied (July 28, 2015), transfer denied (Sept. 22, 2015) (finding that a previous criminal judgment only bars the relitigation of the specific facts and issues that were "unambiguously determined by a previous jury.").

Therefore, defendants' motion regarding the alleged forged consent to search form is **DENIED.**

### 6.    Count I -Board liability

Defendants' only argument on this point is that the Board cannot be liable where the officers did nothing wrong and are entitled to qualified immunity.   Given that this Court has found that questions of material fact remain as to the police officer defendants' actions, the Court cannot grant summary judgment in the board's favor on this basis. The Court, however, has questions as to whether plaintiff has otherwise pled a viable complaint for Board liability under Section 1983.   See analysis of Count IV, below.   The Court, therefore, **ORDERS** plaintiff to prepare an executive summary of his claim in Count I against the Board, stating in five pages or less the essential elements of such a claim and the facts on the record which support such a claim.   Plaintiff's executive summary is due on or before **OCTOBER 17, 2017.**   Defendants shall file a response to the executive summary on or before **OCTOBER 31, 2017**, providing in five pages or less case law and facts in opposition to plaintiff's executive summary.   Thereafter, the Court will rule on the viability of a Section 1983 claim against the Board as pled in Count I of the Amended Complaint.

### 7. Count I - Malicious prosecution under § 1983

As noted above with respect to Defendant Majors, a claim for malicious prosecution under §1983 is not recognized in the Eighth Circuit, which has "uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury." <u>Kurtz v. City of Shrewsbury</u>, 245 F.3d 753, 758 (8th Cir. 2001). Accordingly, summary <u>judgment</u> is **GRANTED** in defendants' favor on plaintiff's claims for malicious prosecution under Section 1983.

### 8. Counts II and III - Conspiracy

Count II pleads a conspiracy claim related to the 2012 search, whereas Count III pleads a conspiracy claim related to the 2013 search. Defendants move to dismiss both claims because there is no evidence of an underlying constitutional deprivation. <u>See White v. McKinley</u>, 519 F. 3d 806, 814-815 (8th Cir. 2008). However, as the Court has found previously, questions of material fact remain as to both searches, and therefore summary judgment cannot be granted on this basis.

Defendants also argue that the evidence does not show a finding of conspiracy on Count II or Count III because there is no factual showing "suggesting a mutual understanding between defendants to *commit unconstitutional acts.*" <u>Smith v. Bacon</u>, 699 F.2d 434, 436 (8th Cir. 1983) (emphasis added). Although the Court agrees with defendants that plaintiff has provided nothing more than conclusory allegations of conspiracy in relation to the 2010 incident, the Court finds that, viewing the case in the light most favorable to plaintiff, the 2012 search could support a conspiracy claim as to defendants Gibbs, Whaley, Onik, and Dumit.[3] Plaintiff has set forth sufficient questions of fact as to whether the meeting between Gibbs, Onik, Whaley, and Dumit prior to the

---

[3] The Court finds plaintiff's conspiracy claim against Martin fails because all Martin did was serve as a uniformed guard at the time of the search, and there is no indication he was aware of the background facts underlying the rationale for the search. He did not attend the meeting prior to the tavern check with the other police officers.

tavern check could constitute a meeting of the minds sufficient for a conspiracy claim. They discussed at this meeting the details of the buy/bust, planning to enter Coffee Wonk without a warrant, conducting a controlled buy, and then seizing the property they found. Plaintiff asserts that at this briefing, Gibbs did not even mention conducting a "license check," potentially supporting plaintiff's position that this was not a dual purpose search, but a pretextual search where the defendants   attempted to cover by saying they were conducting a tavern check.

Thus, for the foregoing reasons, defendants' motion for summary judgment is **GRANTED** as to Count III, as there is no evidence of a meeting of the minds between defendants related to the 2010 search.   Summary judgment is also **GRANTED** as to the conspiracy claim asserted against Defendant Martin.   Defendants' motion for summary judgment as to the remaining claims in Count II is **DENIED.**

### 9.     Count IV – Section 1983 against the Defendant Board - policies, practices, and procedures of the Board

The, the Board indicates it can only be held liable where its employees' actions are "pursuant to official municipal policy" or custom. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 691 (1978).   Here, defendants argue plaintiff cannot show that there were widespread constitutional violations to which the board was deliberately indifferent to, or tacitly authorized. Therefore, Count IV of plaintiff's complaint against the Board must fail.

Plaintiff responds that the Board's customs, policies, and procedures are unconstitutional.   Plaintiff states that the board has an official policy of refusing to discipline officers for Fourth Amendment violations, indicating that the Board's corporate representative testified that the Office of Community Complaints (OCC) refused to determine whether a warrantless search violated the Fourth Amendment, and the OCC has no authority to review the appropriateness of a warrantless search or seizure.   From

this, plaintiff extrapolates that the Board has an official policy to not investigate or discipline officers for Fourth Amendment violations. However, as discussed by defendants in their reply, this argument relies on a logical fallacy: just because the OCC does not review the appropriateness of warrantless searches does not mean that those searches are not reviewed by someone else with the KCPD. Plaintiff has not shown an official municipal policy or custom which would subject the defendant Board to liability with respect to disciplining officers for Fourth Amendment violations.

Additionally, plaintiff argues that the Vice division's custom regarding synthetic cannabinoid offenses was unconstitutional, in that Vice Division never obtained a warrant before engaging in raids similar to those at the Coffee Wonk,[4] engaged in searches attempting to use a license search excuse as subterfuge, and failed to test products after their seizure unless the owner demanded the product back. Plaintiff asserts that these customs were widespread, persistent, and permanent enough to establish liability to the Board. The problem with plaintiff's argument here is that there is no evidence that the Board knew of this conduct. There certainly is no evidence that this was an official policy. And plaintiff has not shown there was "deliberate indifferent to or tacit authorization of [unconstitutional] conduct" by the Board "after official notice to the officials of that misconduct" and "proof that the custom was the moving force behind [a] constitutional violation." Ware v. Jackson County, 150 F.3d 873, 880 (8th Cir. 1998). Therefore, the Court finds that defendants' motion for summary judgment must be **GRANTED** as to Count IV of the Amended Complaint.

### 10. State Law Claims (Malicious Prosecution, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress)

---

[4] The Court notes, however, that the facts of this case demonstrate that Vice "never" obtained a warrant is simply not true, as they obtained a warrant to search plaintiff in 2013.

Plaintiff has pled three state-law claims in his Amended Complaint: Count V: Claim Under Missouri Common Law for Malicious Prosecution (Against Gary Majors and Detectives Gibbs, Whaley, Onik, Dumit, Toigo, and Taylor, Officers Martin, Feagans, and Barbour, and The Board of Police Commissioners of Kansas City, Missouri); Count VI: Intentional Infliction of Emotional Distress (Against Detectives Gibbs, Onik, Dumit, and Martin); and Count VII: Negligent Infliction of Emotional Distress (Against Detectives Whaley, Gibbs, Onik, Dumit, and Martin).

With respect to all three claims, defendants indicate they are entitled to official immunity and are shielded from liability under the public duty doctrine. They also argue that plaintiff cannot demonstrate the essential elements of all three claims. Finally, with respect to the claims against the Board in Count V, defendants argue that sovereign immunity applies and that the Board cannot be held liable on a theory of respondeat superior.

a.    Official Immunity

The official immunity doctrine shields public officers sued in their individual capacity from civil liability for discretionary acts or functions performed in the exercise of official duties. Clay v. Scott, 883 S.W.2d 573, 576 (Mo. Ct. App. 1994). Whether an official's acts were discretionary "depends on the 'degree of reason and judgment required' to perform the act." Davis v. Lambert, 193 S.W.3d 760, 763 (Mo. 2006) (quoting Kanagawa, 685 S.W2d at 836). A discretionary act requires "the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether an act should be done or a course pursued." Bachmann v. Welby, 860 S.W.2d 31, 33 (Mo. Ct. App. 1993) (quoting Rustici v. Weidemeyer, 673 S.W.2d 762, 769 (Mo. 1984)). Official immunity applies to discretionary acts absent malice or bad faith. See Schmidt v. City of Bella Villa, 557 F.3d 564, 575 (8th Cir.2009).

The Missouri Court of Appeals has held that decisions on making arrests, and how to accomplish them are discretionary acts. State ex rel. Boshers v. Dotson, 879 S.W.2d 730 (Mo. Ct. App. 1994). Defendants state that their investigations into plaintiff and were clearly discretionary activities, and therefore they would be entitled to official immunity.

Plaintiff argues, however, that the officers do not have official immunity for ministerial functions—if he was "required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." Rustici v. Weidemeyer, 673 S.W.2d 762, 768–69 (Mo. 1984) (defendant not entitled to official immunity on false arrest claim). Plaintiff argues that the requirement that officers provide only truthful information in warrant applications and indictments is just as prescribed, and official immunity should not be applied to the claims in this case at all.

This Court finds, however, that plaintiff's claims that the defendants provided untruthful information in the warrant applications and indictments fail on their merits. That leaves only plaintiff's claims regarding the alleged violations of his Fourth Amendment rights in the various searches and seizures from 2010 and 2012. With respect to those claims, the Court finds that those claims fall under the official immunity doctrine, which protects discretionary acts, but does not protect ministerial functions. "[A] ministerial function involves clerical duties which a public officer is required to perform upon a given state of facts, in a prescribed manner, in compliance of legal authority, without regard to the public officer's own judgment or opinion on the appropriateness of the act." Clay v. Scott, 883 S.W.2d 573, 576 (Mo.App. E.D. 1994) (citing Kanagawa, 685 S.W.2d at 836). Although if one looks at the 2010 and 2012 searches and seizures broadly they might be covered by official immunity, the Court finds that for the same reasons that summary judgment was denied as related to those searches, that questions

of material fact remain as to whether the officers' actions were taken in the absence of malice or bad faith. For instance, if one were to believe that officers in 2010 forged consent to search forms and had the building manager open suite 201 which otherwise they did not have probable cause to search, one could find such actions to have been taken in bad faith. Additionally, if one were to believe that the 2012 tavern check was performed for the sole purpose of checking for synthetic cannabinoids, and that the officers did not have a reasonable basis for believing that Coffee Wonk had a liquor license, those actions too could be considered to have been taken in bad faith.[5]

The Court, therefore, finds that official immunity does not apply to the aforementioned conduct.

b. Public duty doctrine.

"The public duty doctrine states that a public [officer] is not civilly liable for the breach of a duty owed to the general public, rather than [to] a particular individual." Southers v. City of Farmington, 263 S.W.3d 603, 611 (Mo. 2008). In cases involving the responsibilities of police officers, the meaning of "public duty" is broadly construed. Cooper v. Planthold, 857 S.W.2d 477, 479 (Mo. Ct. App. 1993). However, as noted by plaintiff, the public duty doctrine applies to negligence claims, not intentional torts. Southers, 263 S.W.3d at 611. Accordingly, it does not apply to plaintiff's claims for malicious prosecution and intentional infliction of emotional distress. However, the Court finds that the public duty doctrine would apply to plaintiff's claims for negligent infliction of emotional distress, and for that reason (and for the additional reasons stated below), summary judgment must be granted in defendants' favor as to Count VII of the amended complaint.

---

[5] Similar to its analysis of Count I, however, the Court finds that the claims against defendants Martin and Whaley related to the 2012 search are insufficient to make a finding of bad faith or malice.

c.      Sovereign Immunity.

"Missouri law is clear that Board members who are sued in their official capacities are entitled to sovereign immunity." <u>Johnson v. Bd. Of Police Comm'rs</u>, No. 4:06CV605 CDP, 2007 WL 3171444, at *1 (E.D. Mo. Oct.29, 2007). Under Missouri law, sovereign immunity applies to the operation of the Kansas City Police Department, unless the General Assembly has waived sovereign immunity with respect to the subject claim. <u>Fantasma v. Kansas City, Mo., Bd. of Police Comm'rs</u>, 913 S.W.2d 388, 391 (Mo. App. W.D. 1996). The General Assembly has waived sovereign immunity only with respect to: 1) where a Plaintiff's injury arises from a public employee's negligent operation of a motor vehicle; and 2) where the injury is caused by a dangerous condition on government property. RSMo § 537.600. Neither of those conditions have occurred here.  Plaintiff does not respond to this argument, and for the reasons stated by defendants, plaintiffs' state law claims against the defendant Board fail due to sovereign immunity.

d.      *Respondeat superior*

Because plaintiff's state law claims against the Defendant Board have already been dismissed (<u>see</u> above), the Court does not need to reach this issue.

e.      Count V - malicious prosecution.

The elements of malicious prosecution under Missouri law are: "[1] commencement of prosecution of proceedings against present plaintiffs; [2] its legal causation or instigation by present defendant; [3] its termination in favor of present plaintiff; [4] absence of probable cause for such proceeding; [5] presence of malice therein; and [6] damage by reason thereof. <u>Stafford v. Muster</u>, 582 S.W.2d 670 (Mo. 1979). Defendants argue that, at a minimum, Plaintiff is unable to make out the fourth and fifth elements of this claim.   The Court will examine only the fourth element, finding that an examination of the fifth element is unnecessary under the circumstances.

With respect to probable cause (the fourth element), "it is necessary to consider the manner in which the charge originated, because if the charge is initiated by indictment by a grand jury or by a prosecuting attorney on his sworn information and belief, either amounts to a prima facie showing that probable cause did exist for the prosecution." Hamilton v. Krey Packing Co., 602 S.W.2d 879, 882 (Mo. Ct. App. 1980) (quoting Moad v. Pioneer Finance Co., 496 S.W.2d 794, 798 (Mo.1973). This prima facie showing of the presence of probable cause is conclusive unless rebutted by evidence that "false testimony was the basis of the charge and that the falsity, if so, was discoverable upon reasonable investigation." Moad 496 S.W.2d at 799. In this matter, plaintiff was indicted on two separate occasions, by a prosecuting attorney. Neither indictment resulted in a conviction; however, courts have noted that, " 'while dismissal of defendants' action against plaintiff was some evidence of a lack of probable cause, that alone is not sufficient basis for a conclusion of a lack of probable cause'". Haswell v. Liberty Mut. Ins. Co., 557 S.W.2d 628, 633 (Mo. 1977) (quoting Jones v. Phillips Petroleum Co., 186 S.W.2d 868, 875 (Mo.App.1945)). Defendants argue that there is no evidence that false testimony was the basis of these charges. Plaintiff, on the other hand, argues that the first indictment against plaintiff included a claim that Riggs sold drug paraphernalia, even though plaintiff asserts the officers found there was no evidence of illegal activity when they had searched. Moreover, plaintiff argues that the second indictment alleged that XLR-11 was a controlled substance analogue, and plaintiff states that Gibbs and Onik obtained the indictment on false information because they knew that XLR-11 was not a controlled substances analogue.

The Court finds that plaintiff has not demonstrated the fourth element, lack of probable cause. With respect to the second search warrant, just because XLR-11 did not appear on a list of substances the crime lab was willing or able to testify were

analogues of synthetic cannabinoids, the defendants reasonably relied upon the DEA memo discussed earlier in this Order   With respect to the first indictment, the Court notes that although the charges related to the drug paraphernalia were dropped prior to trial, defendant Toigo testified at plaintiff's state trial that he personally saw a variety of smoking utilities, such as bongs, throughout plaintiff's shop. <u>See</u> Doc. No. 170-6, trial transcript, at 66:23-67:13.   Plaintiff has presented no evidence that false testimony was the basis of the charges against him.   Summary judgment, therefore, is **GRANTED** as to Count V.

f.      Count VI - Intentional infliction of emotional distress.

Defendants argue that plaintiff has failed to establish a claim for intentional infliction of emotional distress.   Defendants state he has failed to demonstrate that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant acted in an intentional or reckless manner; and (3) the defendant's acts caused plaintiff severe emotional distress that resulted in bodily harm." <u>St. Anthony's Medical Center v. H.S.H.</u>, 974 S.W.2d 606, 611 (Mo.Ct.App.1998). Additionally, the plaintiff's emotional distress "must be medically diagnosable and must be of sufficient severity so as to be medically significant." <u>Bass v. Nooney Co.</u>, 646 S.W.2d 765, 772 (Mo.1983).

Plaintiff has provided expert reports from physicians, indicating that he has an adjustment disorder resulting from his treatment in this matter.   Although defendants argue that plaintiff does not have clinically significant depression, that no evidence supports a diagnosis of PTSD, and that plaintiff has normal levels of anxiety, the Court cannot conclude that plaintiff's adjustment disorder is not medically significant based on the evidence before it.

However, as noted by the Missouri Court of Appeals, "it is essential that the conduct be intended *only* to cause emotional distress to the victim. <u>Conway v. St. Louis</u>

Cty., 254 S.W.3d 159, 166 (Mo. Ct. App. 2008) (emphasis added) (finding that, where officers shot plaintiff's son who was swinging a sword at them, that the evidence did not support the conclusion that the officer's actions in shooting and killing plaintiff's son were done solely to cause plaintiff emotional distress). The conduct must be intended only to cause emotional distress to the victim. K.G. v. R.T.R., 918 S.W.2d 795, 799 (Mo. 1996). Here, plaintiff argues that there is a fair inference on the record that detectives Onik, Gibbs, Whaley, and Dumit solely intended to cause Mr. Riggs emotional distress because plaintiff argues these defendants generally did not present their synthetic cannabinoid cases for prosecution, and that plaintiff's case was the only one. See Gibbs Depo., Doc. No. 157-14, 115:6-11 (answering "How many synthetic marijuana cases have you presented for prosecution?" with "I think this is the only one. As I said before, most of the time you go into the places, take the stuff, nobody ever came and asked for their illegal product back."). Defendants state, conversely, that the record does not support the finding of an intention by any defendant to cause plaintiff harm, and instead only supports the intention of the defendants to investigate potential illegal narcotics.

The Court concurs with defendants that the evidence presented in this matter does not support the inference that defendants acted solely with the intent of causing plaintiff emotional distress. Even considering that certain of defendants' actions could be viewed as violating the Fourth Amendment when viewing the facts in the light most favorable to plaintiff, the conclusion that the actions were taken in order solely to cause plaintiff emotional distress does not follow. Accordingly, defendants' motion for summary judgment as to the claims for intentional infliction of emotional distress is **GRANTED.**

     g.  Count VII - Negligent infliction of emotional distress.

As previously discussed, the public duty doctrine shields the individual defendants from liability for this claim. "The threshold requirement to establish tort liability… is the existence of a legal duty on the part of the defendants to conform to a certain standard of conduct to protect others against risks." Lawhon v. City of Smithville, 715 S.W.2d 300, 302 (Mo. App. W.D. 1986) (internal quotations omitted). The plaintiff must show that the officers owed a duty to him directly. Martin v. City of Washington, 848 S.W.2d 487, 493 (Mo. 1993). Police officers engaged in official business typically owe a duty of care only to the general public, not to individuals. Plaintiff has demonstrated no reason to vary from the public duty doctrine in this instance; therefore, plaintiff's claims for negligent infliction of emotional distress fail. Summary judgment is **GRANTED** in defendants' favor on Count VII of the amended complaint.

### C. Plaintiff's Motion for Partial Summary Judgment as to Defendants' Liability (Doc. No. 156).

The Court finds questions of material fact exist as to all remaining issues raised in plaintiff's motion for partial summary judgment as to defendants' liability. Therefore, plaintiff's motion (Doc. No. 156) is **DENIED.**

## V. Conclusion

Accordingly, for all the reasons stated herein, (1) Defendant Gary Majors' Motion for Summary Judgment (Doc. No. 158) is **GRANTED**; (2) Motion for Summary Judgment for Defendants Kansas City Missouri Board of Police Commissioners, Gibbs, Onik, Dumit, Whaley, Toigo, Taylor, Barbour, Feagans and Martin (Doc. No. 160) is **GRANTED IN PART** as to the malicious prosecution claims, filing of false court document claims, and claims related to the 2013 warrant in Count I, as well as the claims against defendants Martin and Whaley in Count I; the claims against defendant Martin in Count II; and all claims in Counts III through VII, and **DENIED IN PART** in all remaining aspects; and (3) Plaintiff's Motion for Partial Summary Judgment as to Defendants' Liability (Doc. No. 156)

is **DENIED**.  The parties are further ordered to prepare executive summaries related to plaintiff's claims in Count I against the defendant Board, as detailed on page 28 of this Order.  Plaintiff's executive summary is due on or before **OCTOBER 17, 2017.** Defendants' response to the executive summary is due on or before **OCTOBER 31, 2017**.

 **IT IS SO ORDERED.**

         **/S/ FERNANDO J. GAITAN, JR.**
         Fernando J. Gaitan, Jr.
         United States District Judge

Dated: September 29, 2017
Kansas City, Missouri